```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------x
United States,
                                            05 CR 254 (KMW)
        -v-                                 ORDER

Kevin O. Kelley,

        Defendant.
--------------------------------------x
```

WOOD, U.S.D.J.:

Defendant contends that he is not physically capable to stand trial. On April 25, 2006 the Court conducted a hearing to assist the Court in ascertaining defendant's physical capability to stand trial. For the reasons stated on the record, and set forth in the following opinion, the Court concludes that Mr. Kelley is physically capable to stand trial at this time, and that a continuance of the May 16, 2006, trial date is not necessary.

As a general matter, the granting or denying of a petition for a continuance on the ground that an accused is incompetent or incapable of standing trial lies in this Court's sound discretion. See, e.g., United States v. Armone, 363 F.2s 385, 402 (2d Cir. 1966). The Second Circuit has indicated that, "where there is a reasonable ground to believe that physical disability may prevent a proper defense or endanger the life of the defendant" "it will usually be the better course" "for the trial court to hold an evidentiary hearing as close to the trial

1

as practical." United States v. Knohl, 379 F.2d 427, 437 (2d Cir. 1967). Such a hearing should "allow cross-examination of the examining doctors and preserve a full record." Id. The Court has limited guidance beyond its own judgment as to what factors to consider because "[c]ases are indeed scarce in which a reviewing court has found an abuse of discretion on the part of a trial judge who has ruled upon an accused's claim that he was physically incompetent to stand trial." Id. Rather, deference is paid to "[t]he [trial] judge's own observation of the accused and the opportunity to adjust itself to needs of one suffering physical disability by shortening court sessions, affording the accused periods of rest and having present such medical and nursing aids and attendants as may be needed." Id.

As noted above, the Court held such a hearing in this case. The Court heard extensive testimony from Mr. Kelley's current primary care physician, John Michael Greeley, and the defendant's wife, Kathryn Kelley. The Court also considered medical records submitted by both sides documenting Mr. Kelley's prior diagnoses and prior medical care, including documentation of defendant's various hospital admissions, and documentation of a series of thorough diagnostic examinations at the Mayo clinic.

The Court found much of Dr. Greeley's testimony credible, including his testimony concerning Mr. Kelley's unhealthy medical

2

conditions, including sleep apnea [Tr. 8],[1] patent foramen ovale [Tr. 9], transient ischemic attacks [Tr. 27], insulin resistance and obesity [Tr. 26]. His testimony concerning defendant's medical conditions did not support his contention that these conditions necessitate a delay of trial.

Dr. Greeley testified that these various conditions have plagued Mr. Kelley for many years. He also testified, on direct examination, that some of the symptoms of Mr. Kelley's heart problems have "ameliorated somewhat" [Tr. 25]. Dr. Greeley testified to various possible treatments that may improve Mr. Kelley's condition, but also acknowledged that any and all treatments could continue during trial. [Tr. 84]

Dr. Greeley offered some conclusory statements to the effect that he believes it will be dangerous for Mr. Kelley to stand trial, but he could not offer any concrete reasons why trial would threaten Mr. Kelley's health in a meaningful way; he simply enumerated the various conditions from which Mr. Kelley will continue to suffer regardless of whether trial proceeds. For example, when pressed to describe the most serious risks facing Mr. Kelley should he stand trial, Dr. Greeley cited a heart condition, patent foramen ovale (a condition found in 20% of the population, according to Dr. John L. Graner, a physician who

---

[1]All citations are to the transcript of the April 25, 2006 hearing unless otherwise noted.

3

treated Mr. Kelley at the Mayo clinic). Mr. Kelley's records from the Mayo clinic further indicate that one of his diagnosticians there, Dr. H. Ting, concluded that no treatment was necessary for this condition. Mr. Kelley is not currently on any medication to treat that condition [Tr. 68], despite the fact that he has had it his entire life, and his doctors have been aware of it for at least the last several years [Tr. 70]. And, even if treatment were advisable, Dr. Greeley freely acknowledged that treatment could commence or continue irrespective of trial.

Moreover, Dr. Greeley admitted that his testimony (and various diagnoses) necessarily relied in large part on patient reporting, that is, what Mr. Kelley had reported to Dr. Greeley in the clinical setting. Dr. Greeley testified that such information is thus not always reliable. [Tr. 89-90, 113-114]. Dr. Greeley did not personally talk to the other doctors who have examined Mr. Kelley [Tr. 14-16, 20], and had not reviewed many of Mr. Kelley's medical records [Tr. 39]. For example, Dr. Greeley did not know the results of some of Mr. Kelley's most recent CAT scans or EEGs [Tr. 56]. The Court concludes Dr. Greeley's opinion that Mr. Kelley should not stand trial now is unsupported by the vast majority of the record.

In addition, the Court credits the affidavit of Dr. John J. Caronna, a neurologist who is the government's expert.[2] Dr. Caronna examined Mr. Kelley on April 28, 2006. He also considered over 17 sets of Mr. Kelley's medical records. Based on these materials and his examination of Mr. Kelley, Dr. Caronna concluded that "Mr. Kelley has no organic disease of the central nervous system and, therefore . . . [is] able to withstand trial." Aff. of John J. Caronna, May 4, 2006. In his letter to the government stating his opinion, Exhibit A to his affidavit, Dr. Caronna observed that

> With regard to [Mr. Kelley's] alleged stroke, I find his weakness and his sensory loss to be unphysiologic and not typical of damage to the central nervous system motor and sensory pathways. With regard to his tremors, they are also not physiologic in that they are present only when the part of the body is examined and they disappear when [Mr. Kelley] is distracted by some other task. True physiological tremors can be voluntarily suppressed with the attention of the patient but when the patient is distracted the tremor returns since it is not volitional. I believe that, on the basis of my exam, his weakness and tremors are volitional and not related to damage to brain structures.

Exhibit A to Caronna Aff. at 7. Dr. Caronna concluded

> On the basis of my review of the medical records pertaining to Mr. Kelley's alleged seizure disorder and stroke, I must conclude that there is no evidence in the records [reviewed] of head trauma of a severity sufficient to produce seizures. His description of the seizures as being childhood generalized seizures and then later focal seizures sometimes affecting the right

---

[2] Mr. Kelley declined by letter dated May 5, 2006, the opportunity to cross-examine Dr. Caronna or to admit any rebuttal evidence.

> side of the body (10/29/04) but mostly the left side of
> the body (3/28 and 4/1/06) is not typical of either
> familial epilepzy or acquired post-traumatic epilepsy.
> In addition he has never had stroke documented on any
> of his CT scans or MRIs and, as I mentioned above, my
> examination on 5/1/06 revealed unphysiologic findings
> suggesting malingering."

Exhibit A to Caronna Aff. At 11.

Most of the medical records in evidence--which were generated before Mr. Kelley was facing imminent trial--support a finding of physical competency. Although Mr. Kelley's records show a history of movement disorder [Tr. 40], migraines, seizures, and possible pseudo-seizure [Tr. 49], they show no evidence of stroke. The MRIs and EEGs were described by Mr. Kelley's doctors as "unremarkable," [Tr. 40, 51]. According to his wife's testimony, even in his alleged decline, Mr. Kelley continues to conduct various life activities, including reading newspapers on the internet and talking to friends on the telephone. Further, he was able to travel to the competency hearing--albeit with some difficulty--by car, train, and subway [Tr. 126-28].

Although the Court believes the testimony that "[t]here is a chance every minute that [Mr. Kelley] could have a heart attack or a stroke anywhere, any time" [Tr. 30] (and indeed that Mr. Kelley is more likely to suffer such an occurrence than the

6

average patient), it is simply not possible to predict if or when

Mr. Kelley will have a stroke [Tr. 28]. To the extent that the evidence presented showed that Mr. Kelley is at a high risk for such an occurrence, it did not establish that trial would meaningfully increase that risk. [See generally Tr. 66, 97-98].

The Court's analysis is not intended to in any way downplay the obvious seriousness of Mr. Kelley's various medical problems. To the extent that Mr. Kelley needs, for example, extra time to get from place to place and to rest, frequent recesses and/or medical assistance, reasonable requests for accommodation will be granted. The Court finds that there is no reason to delay trial. Mr. Kelley faces no imminent danger to his health; Dr Greely's concerns about the stress of trial are unpersuasive. Moreover, the Court is persuaded that it is in the interests of justice to proceed as soon as possible to trial. See 18 U.S.C. §§ 3161(h)(1)(A) and (3)(A).

The defendant's request to delay trial because of physical incapacity is hereby denied.

SO ORDERED.

Dated: New York, New York
May 11, 2006

_____
Kimba M. Wood
United States District Judge